**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **Nikki J. Anderson,** | **Civil No. 01-2000 (ADM/SRN)** |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **Crossroads Capital Partners, LLC, Crossroads, Inc., Video Update, Inc., and James A. Skelton, an individual,** | |
| **Defendants.** | |

---

James Kaster, Esq., and Jennifer Kitchak, Esq., on behalf of Plaintiff[1]

Ronald Lee, Esq., and Daniel Prokott, Esq., on behalf of Defendant Crossroads Capital

Thomas Kane, Esq., and Jodie Johnson, Esq., on behalf of Defendant Skelton

Dawn Van Tassel, Esq., and Justin Perl, Esq., on behalf of Defendant Video Update

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on Defendant Video Update's Motion to Amend to Assert Crossclaims (Doc. No. 20); and on Plaintiff's Motion to Amend the Complaint (Doc. No. 42). This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I. BACKGROUND

Plaintiff has brought claims against Defendants for assault and battery and sex

---

[1] Subsequent to these motions, the law firm of Neaton, Puklich & Klassen substituted as counsel for Plaintiff.



APR 17 2003
FILED ____
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ____
DEPUTY CLERK ____

discrimination under the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363.01 et seq. and Title VII, 42 U.S.C. § 2000e et seq. Plaintiff worked for Video Update as the executive assistant to Video Update's CEO, Daniel Potter. In September of 2000, Video Update filed for Chapter 11 bankruptcy protection. In connection with the bankruptcy restructuring, Video Update contracted with Crossroads Capital Partners (Crossroads) to help with the restructuring. Under the contract, Crossroads provided Video Update with two executives to facilitate the restructuring of Video Update. James Skelton came over from Crossroads and became Video Update's Chief Restructuring Officer. Plaintiff began performing administrative duties for Skelton. Plaintiff alleges that at various times Skelton inappropriately touched her legs, buttocks, breasts, and pubic area and threatened her job. As will be discussed more fully below, Plaintiff compiled records of Skelton's alleged double-billing of Video Update for travel expenses. On May 24, 2001, Skelton terminated Plaintiff.

## II. VIDEO UPDATE'S MOTION TO AMEND TO ASSERT CROSSCLAIMS

By its motion, Video Update seeks to assert crossclaims for contribution and indemnification against co-defendants Crossroads and Skelton for damages arising out of Plaintiff's Title VII, MHRA, and assault and battery claims. Video Update's motion to amend was brought within the time requirements of the Pretrial Scheduling Order.

Under Federal Rule of Civil Procedure 15(a), once responsive pleadings have been served or, in the case of a pleading in which no response is permitted, twenty days have passed from the filing of a pleading, a party may amend its pleadings "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The mandate that leave to amend should be freely given "is to be heeded." Forman v. Davis, 371

U.S. 178, 182 (1962). "There is, however, no absolute right to amend a pleading." Hammer v. City of Osage Beach, 318 F.3d 832, 844 (8th Cir. 2003). Indeed, where there is bad faith, undue prejudice, repeated failures to cure deficiencies, or some other reason justifying denial, a court may, within its discretion, deny leave to amend. E.g., Forman, 371 U.S. at 182; Hammer, 318 F.3d at 844. Additionally, "[i]t is settled that 'if the proposed change . . . advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend.'" Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 225 (8th Cir. 1994) (citations omitted); accord Forman, 371 U.S. at 182 (noting that it is permissible to deny amendment if it would be futile); Hammer, 318 F.3d at 844 (same); Fuller v. Sec'y of Defense, 30 F.3d 86, 88 (8th Cir. 1994) (same).

### A. Contribution Under Title VII

In Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO, 451 U.S. 77 (1981), the Supreme Court held that Title VII did not create a right of contribution, and it would not create such right via federal common law. The Northwest case arose out of a separate case in which Northwest Airlines was found to have violated Title VII and the Equal Pay Act by paying higher wages, pursuant to a collective bargaining agreement negotiated by the employees' union, to its male cabin attendants than its female cabin attendants. Id. at 81. After entry of judgment in the first case, Northwest Airlines brought a claim for contribution against the Union that negotiated and allegedly demanded the discriminatory bargaining agreement. Id. at 81-82. Thus, the precise issue before the Court was

> whether an employer held liable to its female employees for backpay because collectively bargained wage differentials were found to violate the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964 has a federal statutory or

> common-law right to contribution from unions that allegedly bear at least partial responsibility for the statutory violations.

Id. at 80.

The Court noted that a right to contribution generally exists "when two or more persons are liable to the same plaintiff for the same injury and one of the joint tortfeasors has paid more than his fair share of the common liability." Id. at 87-88. The Court assumed for purposes of deciding whether a claim of contribution was even available to Northwest Airlines that all the elements of a typical contribution claim were met–including that the female plaintiffs could have asserted a claim against the Union under Title VII and the Equal Pay Act thereby making two parties liable. Id. at 88-90, 90 n.20 ("The availability of this implied remedy, however, is relevant primarily to the question whether the elements of a contribution claim have been established; if no right to contribution exists at all, it is irrelevant that the elements of a traditional contribution claim may or may not have been established in this case.").

After defining the issue, the Court explained that a right of contribution could be created in two ways: (1) expressly by a statute or inferring it from the statute and (2) via federal common law. Id. at 90. The Court went on to explain and hold that it was clear "[n]either the Equal Pay Act nor Title VII expressly creates a right to contribution in favor of employers;" id. at 91, "there is no implied right to contribution under those statutes;" id. at 95, and "[t]he liability of petitioner [Northwest Airlines] for discriminating against its female cabin attendants is entirely a creature of federal statute" and "it would be improper for us to add a right to contribution to the statutory rights that Congress created in the Equal Pay Act and Title VII." Id. at 97-98.

### 1. Contribution, Title VII, and Skelton

As noted above, the elements of a contribution claim are: (1) two or more defendants/tortfeasors are liable to the same plaintiff for the same injury, and (2) one of the joint tortfeasors/defendants has paid more than its fair share. E.g., id. at 87-88. Thus, in order for Video Update to make a claim of contribution against Skelton (assuming Video Update is held liable to Plaintiff under Title VII), Skelton would also have to be liable to Plaintiff for the same Title VII violation or the same harm. The Eighth Circuit, however, "quite recently has squarely held that supervisors may not be held individually liable under Title VII." Bonomolo-Hagen v. Clay Cent.-Everly Comty. Sch. Dist., 121 F.3d 446, 447 (8th Cir. 1997) (per curiam) (citing Spencer v. Ripley Cty. State Bank, 123 F.3d 690, 691-92 (8th Cir. 1997)) (noting also that Spencer "establishes the law of our circuit"); Schoffstall v. Henderson, 223 F.3d 818, 821 n.2 (8th Cir. 2000); Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1111 (8th Cir. 1998); see also Haynes v. Williams, 88 F.3d 898, 901 (10th Cir. 1996) ("[S]tatutory liability [under Title VII] is appropriately borne by employers, not individual supervisors."); Gary v. Long, 59 F.3d 1391, 1399 (D.C. Cir. 1995) ("[W]hile a supervisory employee may be joined as a party defendant in a Title VII action, that employee must be viewed as being sued in his capacity as the agent of the employer, who is alone liable for a violation of Title VII."); Klaahsen v. APCOA/Standard Parking, Inc., No. Civ. 02-620, 2002 WL 1397041, at *8 (D. Minn. June 26, 2002) ("Whatever question remained open by the Eighth Circuit's opinion in *Lenhardt* was firmly closed in *Spencer* and *Bonomolo-Hagen*."). Since Skelton cannot be held individually liable to Plaintiff under Title VII, Video Update's claim for contribution against Skelton would fail as a matter of law because

the first element of a contribution claim cannot be met–Skelton and Video Update cannot both be liable to Plaintiff for a Title VII violation.[2] See Gilmore v. List & Clark Const. Co., 866 F.Supp. 1310, 1311-13 (D. Kan. 1994) (dismissing, in a Title VII sex discrimination case, an employer's contribution and indemnity claim against its vice president). Moreover, even if there was common liability between Video Update and Skelton under a combination of theories such as Title VII and assault and battery, this Court would not allow Video Update's contribution claim against Skelton with respect to Title VII liability because, as discussed infra Part II(B)(2), it would dramatically frustrate the statutory scheme. Therefore, Video Update's motion to amend to assert a contribution claim against Skelton with respect to Title VII is futile and is denied.

**2. Contribution, Title VII, and Crossroads**

Unlike Skelton, Crossroads did not oppose the merits of Video Update's proposed claim for contribution for a Title VII violation. Rather, Crossroads simply argued that Video Update's proposed contribution claim is premature, citing Minnesota state cases, because there has not yet been a finding of liability on the underlying claim and such claims would require additional discovery.

Although the right to contribution may not necessarily accrue until two tortfeasors have been held liable to the same plaintiff for the same harm and one joint tortfeasor actually pays more than its fair share, "it is not necessary to wait until after liability has been fixed to bring an action for contribution." Grothe v. Shaffer, 232 N.W.2d 227, 232 (Minn. 1975); accord Rice

---

[2] In Northwest Airlines, the Court assumed, in order to decide the larger question of whether a contribution right exists at all, that the plaintiff employees could assert a claim against both Northwest Airlines and the Union and that all the elements of a contribution claim could be met. Id. at 88-90, 90 n.20.

Lake Contracting Corp. v. Rust Env't. and Infrastructure, Inc., 1998 WL 148082, at *6 (Minn. App. March 31, 1998) (unpublished); Blomgren v. Marshall Mgmt. Serv., Inc., 483 N.W.2d 504, 507 n.4 (Minn. App. 1992). Rather, one may bring a contribution action prior to the fixing of liability, and the contribution claim is merely "contingent on the outcome of the original action and upon the payment by one joint tortfeasor of more than his fair share of the common obligation." Shaffer, 232 N.W.2d at 233; accord Rice Lake, 1998 WL 148082, at *6 (unpublished); Blomgren, 483 N.W.2d at 507 n.4. Thus, even Minnesota law, which Crossroads relies on for support, would allow the timing of the contribution claim.

Crossroads' argument that additional discovery would be burdensome fails. Crossroads simply states that any contribution claim will unquestionably result in additional discovery, yet it fails to point to a single item or avenue of discovery that it must pursue. Crossroads' conclusory statements are insufficient to overcome the proposition that leave to amend is to be freely given.

The futility of Video Update's claim for contribution against Crossroads was not discussed by either party. Neither Crossroads nor Video Update made any argument concerning whether a claim for contribution by Video Update against Crossroads (or vice versa) would be barred as a matter of law by Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO, 451 U.S. 77 (1981) and the decisions applying it. Indeed, Video Update simply focused on the liberal standards for amendment under Federal Rule of Civil Procedure 15, and Crossroads focused on timing and discovery issues. Northwest Airlines appeared to clearly bar claims of contribution by an employer against another party (in that case a union) that may also be liable to a plaintiff, but some courts have arguably held that Northwest Airlines carved out an exception to its general rule where the two potentially liable parties are both named as defendants. For an

example of the problematic case law in this area, compare e.g., In re Burlington N., Inc. Employment Practices Litig., 810 F.2d 601, 609-10 (7th Cir. 1987), and Braun et al. v. World Wide Inc. et al., 1998 WL 68718 (D. Minn. Jan. 6, 1998), with Anderson v. Local Union No. 3, 751 F.2d 546, 548 (2d Cir. 1984) (affirming 582 F.Supp. 627, 630-31 (S.D.N.Y. 1984)), Sears v. Atchison, Topeka & Santa Fe Ry., Co., 749 F.2d 1451, 1454-55 (10th Cir. 1984), Coleman v. Casey County Bd. of Educ., 686 F.2d 428, 430 n.1 (6th Cir. 1982), and United States v. Yonkers Bd. of Educ., 594 F.Supp. 466, 474-75 (S.D.N.Y. 1984). Moreover, Crossroads did not make any argument that it cannot be held liable to Plaintiff because it was not Plaintiff's employer, which would preclude the assertion of Video Update's contribution claim because Crossroads and Video Update would not have common liability. For an example of the problematic case law in this area, compare e.g., Sibley Mem'l Hosp. v. Wilson, 488 F.2d 1338, 1339-42 (D.C. Cir. 1973), Moland v. Bil-Mar Foods, 994 F.Supp. 1061, 1068, 1071-73 (N.D. Iowa 1998), and King v. Chrysler Corp., 812 F.Supp. 151, 152-54 (E.D. Mo. 1993), with Bender v. Suburban Hosp., Inc., 159 F.3d 186, 188-92 (4th Cir. 1998), E.E.O.C. v. State of Illinois, 69 F.3d 167, 168-69 (7th Cir. 1995), Alexander v. Rush N. Shore Medical Ctr., 101 F.3d 487, 490-93, 493 n.2 (7th Cir. 1996), and Hunt v. State of Missouri, 297 F.2d 735, 740-43, 743 n.4 (8th Cir. 2002). Given the fact that it is not entirely clear the above issues would render Video Update's claim futile as a matter of law and the fact that neither party addressed such issues, this Court grants Video Update leave to amend with respect to asserting a claim for contribution against Crossroads for liability under Title VII.[3] This Court recognizes that it has a responsibility, although

---

[3] With respect to the issue of whether Crossroads was Plaintiff's employer, the Court notes that Plaintiff does allege in her complaint that "[a]s part of her duties as an executive

discretionary, to deny an amendment where the proposed claims would be futile. Here, despite having doubts about the validity of Video Update's proposed claims, the Court thinks it is more appropriate to resolve such issues after the parties have thoroughly sharpened the issues for review.

### B. Contribution Under the MHRA

Under Minnesota common law, contribution rests on equitable principles.[4] E.g., Lambertson v. Cincinnati Welding Corp., 257 N.W.2d 679, 685-86 (Minn. 1977); United States v. J&D Enter., 955 F.Supp. 1153, 1157 (D. Minn. 1997). Under contribution, one party that has been forced to absorb an entire loss is allowed to force those that are also liable to contribute their fair share. J&D Enter., 955 F.Supp. at 1157. "The essential elements of a contribution claim are (1) common liability of two or more actors to the injured party; and (2) the payment by one of the actors of more than its fair share of that common liability." Nuessmeier Elec., Inc. v. Weiss Mfg. Co., 632 N.W.2d 248 (Minn. App. 2001).

"In construing the MHRA, we [Minnesota courts] apply law developed in federal cases arising under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e-2000e-17 (1994)." Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999); accord Wayne v. MasterShield, Inc., 597 N.W.2d 917, 921 (Minn. App. 1999) ("In interpreting cases under the

---

assistant at Video Update, Plaintiff also was required to provide administrative assistance to Skelton and Crossroads." (Second Am. Compl. ¶9). This, taken as true, may provide another reason to dispose of the employment relationship futility issue.

[4] Minn. Stat. § 548.19 relating to contribution "did not change the substantive law of contribution, but simply provided a summary method for enforcing the right." Gustafson v. Johnson, 51 N.W.2d 108, 115-16 (Minn. 1952).

Minnesota Human Rights Act, we give strong weight to federal court interpretations of Title VII claims because of substantial similarities between the two statutes."). Minnesota courts will, however, depart from federal cases interpreting Title VII where differences in the MHRA require it. See Kolton v. County of Anoka, 645 N.W.2d 403, 407 (Minn. 2002).

There is not an appreciable difference between Title VII and the MHRA regarding contribution as both statutes were clearly enacted for the benefit of employees rather than to protect employers or provide employers with a cause of action. Compare Northwest Airlines, 451 U.S. at 92 ("[I]t can not possibly be said that employers are members of the class for whose especial benefit either the Equal Pay Act or Title VII was enacted."), with Cummings v. Koehnen, 568 N.W.2d 418, 422 (Minn. 1997) (explaining that one of the purposes of the MHRA "includes protecting Minnesota employees from sexual harassment"), Costilla v. State, 571 N.W.2d 587, 593 (Minn. App. 1997) (noting "the MHRA's broad purpose of requiring employers to take timely and appropriate action to protect employees from sexual harassment"), and Davis v. Hennepin County, 559 N.W.2d 117, 121 (Minn. App. 1997) ("[T]he MHRA was enacted to protect the general public, but through enforcement of an individual's right to be free from discrimination in employment . . . ."). In 1975, however, the Minnesota Supreme Court upheld an award of contribution by a hearing examiner. Brotherhood of Ry. and S.S. Clerks v. State by Balfour, 229 N.W.2d 3, 14 (Minn. 1975). In Brotherhood of Ry. and S.S. Clerks, the plaintiffs sued their employer, a railroad, and their union for discriminatory treatment under the collective bargaining agreement pursuant to Minn. Stat. § 363.01 et seq. (the MHRA). Id. at 7-8. The hearing examiner found that the union and the railroad had discriminated against the plaintiffs. Id. In awarding backpay to the plaintiffs, the hearing examiner "charged the union with the

entire amount of the award and allowed them to seek contribution from the railroad for such backpay as had accrued within 6 months of the commencement of the proceedings under consideration." Id. at 14. On review, the district court reversed the hearing examiner and held that the union was entitled to 50% contribution from the railroad. Id. The Minnesota Supreme Court reinstated the hearing examiner's decision "as to contribution by the railroad." Id. From the Court's opinion, it is not clear whether *the union* held the right of contribution or whether *the hearing examiner* simply fashioned its award of backpay such that the railroad was required to pay 6 months worth of backpay. It does not appear that the Minnesota courts have revisited the issue of whether there is a right of contribution under the MHRA, and the parties have not pointed this Court to any additional authority. In addition, unlike federal common law, Minnesota has long recognized the right of contribution in various contexts. See generally Parten v. First National Bank & Trust Co., 283 N.W. 408, 412-13 (Minn. 1938).

**1. Contribution, the MHRA, and Crossroads**

As with Title VII, neither Crossroads nor Video Update made any argument concerning whether a claim for contribution by Video Update against Crossroads (or vice versa) for potential liability under the MHRA would be barred as a matter of law. Given the procedural posture of this motion, the fact that Minnesota law recognizes a right of contribution in various contexts unlike federal common law, the fact that the Brotherhood of Ry. and S.S. Clerks case arguably allowed contribution in a MHRA case, and the fact that neither party has addressed the futility issue, Video Update is granted leave to assert a claim for contribution against Crossroads for any potential liability under the MHRA. In allowing a claim for contribution to be asserted at this stage, this Court is simply reserving judgment, as with the Title VII contribution claim, until the

merits of the propriety of a contribution claim are properly illuminated by the parties.

### 2. Contribution, the MHRA, and Skelton

The Minnesota Supreme Court does not appear to have directly addressed the issue of whether a supervisor can be held individually liable under the MHRA and the parties have pointed this Court to no authority. Cf. Farmer's State Bank v. Swisher, 631 N.W.2d 796, 797 (Minn. 2001) (noting without further comment that the district court dismissed the MHRA claims against the bank president because he was not an "employer" for purposes of the MHRA). This is important because Video Update's contribution claim against Skelton depends on, among other things, there being common liability.

In Obst v. Microtron, Inc., 588 N.W.2d 550, 553-54 (Minn. App. 1999), the Minnesota Court of Appeals decided whether a vice president and general manager of a company could be held personally liable under the Minnesota Whistleblower Act, Minn. Stat. § 181.932. The Obst court noted that it was a case of first impression. Id. at 553. In deciding the issue, the Obst court relied on federal cases holding that there is no individual liability for employees or supervisors under Title VII and compared the definition of "employer" in the Whistleblower Act with the definition in Title VII. Id. at 553-54. The court explained that the definition of "employer" in the Whistleblower Act was much narrower than that in Title VII. Id. a 554. Accordingly, the Obst court concluded that "[u]nder the unambiguous language of the statute, the definition of employer in the Minnesota whistleblower act does not impose liability on individual supervisors." Id.; accord Anderson-Johanningmeier v. Mid-Minnesota Women's Ctr., Inc., No. C3-02-938, 2003 WL 42273, at *2 n.3 (Minn. App. Jan. 7, 2003).

The Whistleblower Act defines "employer" as "any person having one or more employees

in Minnesota and includes the state and any political subdivision of the state." Minn. Stat. § 181.931, subd. 3. The MHRA defines "employer" as "a person who has one or more employees." Minn. Stat. § 363.01, subd. 17. Thus, the definitions of employer in both Acts are nearly identical. Accordingly, it seems clear that at least the Minnesota Court of Appeals would hold, as it did under a nearly identical definition in the Whistleblower Act, that individual employees and supervisors are not "employers" under the MHRA, and, thus, are not subject to individual liability.[5]

The Obst court relied largely on federal cases interpreting Title VII to conclude that the Minnesota Whistleblower Act does not impose individual liability on supervisors. The Obst court was correct. The vast majority of Federal Circuit Courts of Appeals have held that there is no individual liability for employees or supervisors under Title VII. See generally Lenhardt v. Basic Inst. of Tech., 55 F.3d 377, 380-81 (8th Cir. 1995) (surveying cases from sister circuits holding that supervisors are not subject to individual liability under Title VII). Indeed, the Eighth Circuit "quite recently has squarely held that supervisors may not be held individually liable under Title VII." Bonomolo-Hagen v. Clay Cent.-Everly Comty. Sch. Dist., 121 F.3d 446, 447 (8th Cir. 1997) (per curiam) (citing Spencer v. Ripley Cty. State Bank, 123 F.3d 690, 691-92 (8th Cir. 1997)); see also e.g., Haynes v. Williams, 88 F.3d 898, 901 (10th Cir. 1996); Gary v. Long, 59 F.3d 1391, 1399 (D.C. Cir. 1995). Title VII is the federal counterpart to the MHRA, and, as noted, "in construing the MHRA, we [Minnesota courts] apply law developed in federal

[5] Individual employees may be subjected to liability under one specific provision of the MHRA. § 363.03, subd. 6 prohibits any person from aiding and abetting a violation. Liability under this section does not appear to be at issue in this case.

cases arising under Title VII of the 1964 Civil Rights Act." Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999). Therefore, this Court would expect the Minnesota courts to hold that employees and supervisors are not subject to individual liability under the MHRA, except as noted. See supra note 5.

Finally, in Lenhardt, the Eighth Circuit was forced to decided whether a supervisor/president/sole shareholder was subject to individual liability under the Missouri Human Rights Act because the supervisor/president was an "employer." 55 F.3d at 378. The Eighth Circuit predicted that "the Missouri Supreme Court would hold that the definition of the term employer in the MHRA does not subject employees, including supervisors or managers, to individual liability." Id. at 381. This Court believes the Minnesota Supreme Court would hold the same, except as noted. See supra note 5. Indeed, one court within this district has so held. Waag v. Thomas Pontiac, Buick, GMC, Inc., 930 F.Supp. 393, 407-08 (D. Minn. 1996) (holding that supervisors "cannot be held individually liable under Title VII and the MHRA").

Since Skelton cannot be held liable under the MHRA, the elements of a contribution claim cannot be met and Video Update's contribution claim is futile. Moreover, even if there was common liability between Video Update and Skelton under a combination of theories such as the MHRA and assault and battery, this Court would not allow Video Update's contribution claim against Skelton with respect to MHRA liability. Where a statutory scheme would be upset by the maintenance of a contribution claim, such claim will not be allowed. See Conde v. City of Spring Lake Park, 290 N.W.2d 164, 166 (Minn. 1980) (explaining that the Civil Damages Act was "designed to penalize the illegal sale of liquor and to provide a remedy to those damaged by the illegal sale. Imposing liability on the vendors and not allowing contribution from the

intoxicated person acts as an incentive to the vendors to avoid illegal sales. It also reflects the legislative judgment that the vendors can best bear the loss. . . . [A]llowing contribution from the intoxicated person would thwart these purposes."). Here, the MHRA (at least in the context of harassment) was designed to penalize those employers that do not take appropriate measures to rectify harassing conduct (hostile work environment) and penalize employers for employing unfit persons in supervisory roles (quid pro quo) while providing a remedy to the employees of such employers who are forced to deal with an uncorrected hostile environment or affected by quid pro quo demands. See cases cited supra Part II(B). Imposing liability on employers and not allowing contribution from the offending employee acts as an incentive to the employers to "impose some form of discipline upon the offending employee. That discipline may include a 'free pass' to the unemployment line." Lenhardt, 55 F.3d at 381. This also reflects the legislative judgement that employers can best bear the loss. Further, allowing contribution from the employee would thwart these purposes because it would lessen the incentive imposed on employers to correct wrongful conduct and seek fit supervisory personnel. See generally Gilmore v. List & Clark Const. Co., 866 F.Supp. 1310, 1311-13 (D. Kan. 1994) (holding that employer not allowed to seek contribution from employee for Title VII violation).

Thus, Video Update's contribution claim against Skelton will not be allowed.

### C. Contribution for Assault and Battery

Video Update seeks contribution from Crossroads and Skelton for any liability it may have under Plaintiff's assault and battery claim. Skelton will be liable if he committed the intentional torts of assault or battery. Video Update and/or Crossroads will be liable for Skelton's alleged assault or battery if the doctrine of respondeat superior is established

(employer/employee relationship). "Under the 'well-established principle' of respondeat superior, 'an employer is vicariously liable for the torts of an employee committed within the course and scope of employment.'" Fahrendorff ex rel. Fahrendorff v. N. Homes, Inc., 597 N.W.2d 905, 910 (Minn. 1999). The liability for respondeat superior is characterized as "joint and several liability." Schneider v. Buckman, 433 N.W.2d 98, 101 (Minn. 1988). Thus, the essential elements of a contribution claim by Video Update against either Skelton or Crossroads could quite clearly be met because all would have a common liability for the alleged assault or battery. See generally Nuessmeier Elec., Inc. v. Weiss Mfg. Co., 632 N.W.2d 248 (Minn. App. 2001) ("The essential elements of a contribution claim are (1) common liability of two or more actors to the injured party; and (2) the payment by one of the actors of more than its fair share of that common liability."); see also Oelschlager v. Magnuson, 528 N.W.2d 895, 899 (Minn. App. 1995) ("A party that is only vicariously liable for another's intentional tort has neither deliberately caused harm nor committed a tort, so the intentional tort theory does not operate to bar [the] right to contribution.").

The fact that Skelton may be an employee of Video Update and Crossroads, his permanent employer, can be a perplexing but not new concept. For instance, under the "loaned/borrowed servant doctrine," "if an employer loans an employee to another for the performance of some special service, then that employee, with respect to that special service, may become the employee of the party to whom his services have been loaned." Danek v. Meldrum Mfg. & Engineering Co., Inc., 252 N.W.2d 255, 258 (Minn. 1977). Id. Although the loaned servant doctrine typically applies in workers compensation cases, it also applies "where

an injured third party seeks to impose vicarious liability on the special employer of a loaned employee who caused his injury," id. at 258 n.2, or where a defendant general employer seeks to shift liability for the servant's acts to the special employer. See Minnkota Power Co-op, Inc. v. Manitowoc Co. Inc., 669 F.2d 525, 529, 531-32 (8th Cir. 1982) ("A finding of liability based on the borrowed servant doctrine ordinarily will absolve the general employer of liability and shift total liability for the servant's negligent acts to the borrowing employer. A total shift in liability does not occur, however, when the servant simultaneously performs an act which falls within the scope of employment for both the general employer and the borrowing employer.") (citations omitted).

Accordingly, Video Update may assert a claim for contribution against Skelton and Crossroads with regard to Plaintiff's assault and battery claim.

**D. Indemnity Under Title VII and the MHRA**

Video Update seeks common law indemnification from both Crossroads and Skelton and contractual indemnification from Crossroads.

**1. Common Law Indemnity Under Title VII and the MHRA**

This Court need not decide whether common law claims for indemnification for a Title VII violation are completely barred by Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO, 451 U.S. 77 (1981), see, e.g., Anderson v. Local Union No. 3, 751 F.2d 546, 548 (2d Cir. 1984) ("The rationale of this holding [Northwest Airlines case] extends to claims for indemnification); E.E.O.C. v. Gard Corp., 795 F.Supp. 1070, 1072 (D. Kan. 1992) (same), or whether claims for indemnification, like those for contribution, arguably were preserved by footnote 28 of Northwest Airlines when both defendants are named in the complaint, see In re

Burlington N., Inc. Employment Practices Litig., 810 F.2d 601, 609-10 (7th Cir. 1987); Braun et al. v. World Wide Inc. et al., 1998 WL 68718 (D. Minn. Jan. 6, 1998). This is so because Video Update cannot assert a common law claim for indemnification against Crossroads or Skelton as a matter of law.

Indemnity arises out of a contractual relationship or by implication in certain situations,[6] and it allows a party held liable, unlike contribution, to shift the *entire* burden of liability to another party. E.g., United States v. J&D Enter., 955 F.Supp. 1153, 1157 (D. Minn. 1997) (quoting Minnesota state cases). A defendant cannot assert a common law claim for indemnification where such defendant is independently liable to the plaintiff. This principle applies equally to Title VII and the MHRA. Rather, "[t]he general rule is that 'tortfeasors must accept responsibility for damages commensurate with their own relative culpability . . . .' They

[6] In Minnesota, indemnity is only allowed in four situations:
(1) Where the one seeking indemnity has only a derivative or vicarious liability for damage caused by the one sought to be charged.
(2) Where the one seeking indemnity has incurred liability by action at the direction, in the interest of, and in reliance upon the one sought to be charged.
(3) Where the one seeking indemnity has incurred liability because of a breach of duty owed to him by the one sought to be charged.
(4) Where there is an express contract between the parties containing an explicit undertaking to reimburse for liability of the character involved.

Hendrickson v. Minnesota Power & Light Co., 104 N.W.2d 843, 848 (Minn. 1960). The Hendrickson court did include another situation (where the one seeking indemnity has incurred liability merely because of failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged) where indemnity was available, but the court later eliminated that avenue of indemnity in Tolbert v. Gerber Indus., Inc., 255 N.W.2d 362, 367-68 (Minn. 1977). The Tolbert court further explained situations 1 through 3 as follows: "In situations covered by Rules 1, 2, and 3, the party who seeks indemnity has been held liable even though not personally at fault. . . . In cases under Rule 3, the party seeking indemnity is again without personal fault . . . ." Id. at 366. Video Update's liability, if any, derives from its own independent, statutory fault.

are not entitled to indemnity for damages caused by their own negligence." Fossum v. Kraus-Anderson Const. Co., 372 N.W.2d 415, 417 (Minn. App. 1985). The Restatement (Third) of Torts is also instructive. The Restatement provides: "Except for contractual indemnity, a vicariously liable person can obtain indemnity from the person whose negligence was imputed only if the vicariously liable person is not independently liable." RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 22 cmt. e (1999). Here, if Video Update is liable at all, it will be independently liable under Title VII and/or the MHRA for its own statutory violation, not merely vicariously liable. See Northwest Airlines, 451 U.S. at 97 (explaining that "[t]he liability of petitioner [Northwest Airlines] for discriminating against its female cabin attendants is entirely a creature of federal statute"). Moreover, as discussed supra Part II(B)(2), allowing common law indemnification, at least against Skelton, would dramatically frustrate Title VII and the MHRA's statutory schemes.

Therefore, Video Update may not assert a common law claim for indemnification against Skelton or Crossroads for any liability Video Update may have under Title VII or the MHRA.

**2. Contractual Indemnity under Title VII and the MHRA**

Video Update's proposed amendment only asserts a claim for contractual indemnity against Crossroads. (Def. Video Update's Proposed Crossclaim Against Defendants Crossroads and Skelton, at 2-3, "Count I–Common-Law Indemnification and Contribution (Against Crossroads)," "Count II–Common-Law Indemnification and Contribution (Against Skelton)," "Count III–Contractual Indemnification and Contribution (Against Crossroads)"). This makes sense because Skelton does not appear to have signed the "Letter Agreement" in his personal capacity. Crossroads does not oppose the merits of Video Update simply asserting this claim.

The "Letter Agreement" that forms the basis of Video Update's indemnity claim against Crossroads provides as follows:

> Crossroads shall not be subject to any liability to Company [Video Update] for any act or omission relating to, in connection with or arising out of services rendered hereunder, unless Crossroads' acts or omissions constitute willful malfeasance, gross negligence or the reckless disregard of Crossroads' obligations or duties hereunder.

(Def. Video Update's Proposed Crossclaim Against Defendants Crossroads and Skelton, at ¶27). This language arguably provides some sort of indemnification, and a ruling otherwise at this stage would be premature. Therefore, Video Update may assert a claim for contractual indemnity against Crossroads for any liability it may have under Title VII or the MHRA.

### E. Indemnity for Assault and Battery

Video Update seeks common law and contractual indemnity from Crossroads and common law indemnity from Skelton for Plaintiff's assault and battery claim. Neither Crossroads nor Skelton oppose the merits of whether Video Update can simply asserting this claim.

By the nature of respondeat superior liability for assault and battery, Video Update may be liable for Skelton's conduct even though Video Update is entirely without fault. E.g., Porter v. Grennan Bakeries, 16 N.W.2d 906, 909-10 (Minn. 1945) ("Under the doctrine of respondeat superior, . . . vicarious liability to third persons is imposed upon the master for his servant's torts, not because the master is at fault, . . . but because the servant is conducting the master's business, and because the social interest in the general security is best maintained by holding those who conduct enterprises in which others are employed to an absolute liability for what their servants do in the course of the enterprise."). Thus, Video Update *may*, as the facts develop, have a

common law right to indemnity from Crossroads under Hendrickson situation 3. Under the Letter Agreement, Video Update has an arguable right to contractual indemnity from Crossroads (Hendrickson situation 4). Therefore, Video Update can assert a claim for common law and contractual indemnity against Crossroads for any liability it may have under Plaintiff's assault and battery claim.

Video Update may also assert a claim for common law indemnity for the assault and battery against Skelton under Hendrickson situation 1, and, as the facts develop, possibly situation 3.

To summarize, in regard to the proposed contribution claims: (1) Video Update's request for leave to assert a contribution claim against Skelton with regard to Title VII is denied; (2) Video Update's request for leave to assert a contribution claim against Skelton with regard to the MHRA is denied; (3) Video Update's request for leave to assert a contribution claim against Skelton with regard to assault and battery is granted; (4) Video Update's request for leave to assert a contribution claim against Crossroads with regard to Title VII is, at this stage, granted; (5) Video Update's request for leave to assert a contribution claim against Crossroads with regard to the MHRA is, at this stage, granted; and (6) Video Update's request for leave to assert a contribution claim against Crossroads with regard to assault and battery is granted. In regard to the proposed indemnification claims: (1) Video Update's request for leave to assert an indemnification claim against Skelton with regard to Title VII is denied; (2) Video Update's request for leave to assert an indemnification claim against Skelton with regard to the MHRA is denied; (3) Video Update's request for leave to assert a common law indemnification claim against Skelton with regard to assault and battery is granted; (4) Video Update's request for leave

to assert an indemnification claim against Crossroads with regard to Title VII is denied as to common law indemnification and granted as to contractual indemnification; (5) Video Update's request for leave to assert an indemnification claim against Crossroads with regard to the MHRA is denied as to common law indemnification and granted as to contractual indemnification; and (6) Video Update's request for leave to assert a common law and contractual indemnification claim against Crossroads with regard to assault and battery is granted.

## III. PLAINTIFF'S MOTION TO AMEND TO SEEK PUNITIVE DAMAGES ON HER ASSAULT AND BATTERY CLAIM

Plaintiff seeks to amend her complaint to add a claim for punitive damages in connection with her assault and battery claim against Skelton, Video Update, and Crossroads.

Skelton does not oppose Plaintiff's motion to amend to seek punitive damages. Rather, Skelton submits that in order for Plaintiff to ultimately recover under both the MHRA claim and the assault and battery claim, she must show by clear and convincing evidence that the misconduct supporting both awards is different.

### A. Requirements to Assert a Claim for Punitive Damages

Minn. Stat. §§ 549.191 and 549.20 furnishes the framework for pleading a claim for punitive damages where the claim is based upon Minnesota law. E.g., Hern v. Bankers Life Cas. Co., 133 F.Supp.2d 1130, 1134-35 (D. Minn. 2001). Under § 549.191, a plaintiff may not plead punitive damages as an original matter; rather, a plaintiff must seek leave of the court based on a prima facie showing of entitlement. Under § 549.20,[7] a plaintiff can establish a prima facie

[7] Minn. Stat. § 549.20 Subdivision 1 reads:
(a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for

showing of entitlement to plead punitive damages by demonstrating through clear and convincing evidence that the defendant deliberately disregarded the rights or safety of others.[8] "The term 'prima facie' does not refer to a quantum of evidence, but to a procedure for screening out unmeritorious claims for punitive damages." Swanlund v. Shimano Indus. Corp., 459 N.W.2d 151, 154 (Minn. App. 1990). A court does not make credibility findings and does not consider evidence offered in opposition. E.g., id. Rather, the court examines the plaintiff's evidence and determines if such evidence left unrebutted would reasonably allow a conclusion that clear and convincing evidence will establish that the defendant deliberately disregarded the rights or safety of others. E.g., id.

An employer can be vicariously liable for punitive damages due to an act committed by its agent that supports the imposition of punitive damages. Minn. Stat. § 549.20, subd. 2 provides:

> Punitive damages can properly be awarded against a master or principal because of an act done by an agent only if:
> (a) the principal authorized the doing and the manner of the act, or
> (b) the agent was unfit and the principal deliberately disregarded a high probability that the agent was unfit, or

---

the rights or safety of others.
(b) A defendant as acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

[8] Clear and convincing evidence is that which is more than a preponderance but less than proof beyond a reasonable doubt. Olson v. Snap Prod., Inc., 29 F.Supp.2d 1027, 1036 (D. Minn 1998).

(c) the agent was employed in a managerial capacity with authority to establish policy and make planning level decisions for the principal and was acting in the scope of that employment, or
(d) the principal or a managerial agent of the principal, described in clause (c), ratified or approved the act while knowing of its character and probable consequences.

### 1. Assault and Battery, Punitive Damages, and Skelton

To establish a claim for assault, a plaintiff "must prove an unlawful threat to commit bodily harm, with the present ability to carry out the threat." Pfeffer v. 3M Co., 1993 WL 107774, at *4 (Minn. App. Apr. 13, 1993) (unpublished); accord Cressy v. Republic Creosoting Co., 122 N.W. 484, 485 (Minn. 1909). To establish a claim for battery, a plaintiff must prove there was an intentional unpermitted offensive contact by Skelton. E.g., Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980).

Plaintiff has established a claim for assault and battery. Plaintiff has presented evidence that during car rides to various places Skelton threatened to touch Plaintiff in offensive ways and had the ability to do so. Plaintiff has also presented evidence that Skelton stared at her, crowded her against a wall, and grabbed her buttocks. (Kitchak Aff. Ex. A., at 372-74). Plaintiff has also produced clear and convincing evidence that if left unrebutted would demonstrate Skelton touched her in an offensive way on her breasts, buttocks, pubic area, and legs. (Kitchak Aff. Ex. A, at 302-03, 330-31, 336-37, 374, 400, 405-06, 413).

Looking only at Plaintiff's evidence as this Court must for purposes of this motion, Plaintiff has presented enough evidence to establish an entitlement to plead a claim for punitive damages for Skelton's assault and battery. The evidence if left unrebutted would clearly establish that Skelton deliberately disregarded Plaintiff's right to be free from threats of offensive

contact and actual offensive contact. Plaintiff's evidence shows that Skelton had knowledge that Plaintiff found the touching and threats of touching to be offensive because Plaintiff told Skelton to stop and would remove Skelton's hands. (Kitchak Aff. Ex. A., at 302, 330-31, 334-37, 400-01) Nevertheless, according to Plaintiff, Skelton would respond with such comments as "you better be nice to me if you want to keep your job." (Kitchak Aff. Ex. A., at 400-01). Knowing that such threats and contact were offensive, Skelton deliberately proceeded to touch Plaintiff in an offensive manner multiple times and on multiple parts of Plaintiff's body. (Kitchak Aff. Ex. A, at 302-03, 330-31, 334-37, 374, 400-01, 405-06, 413). Thus, Plaintiff may assert a claim for punitive damages against Skelton for assault and battery.

### 2. Assault and Battery, Punitive Damages, and Video Update

Video Update argues that none of the criteria listed in Minn. Stat. § 549.20, subd. 2 apply. Specifically, Video Update argued at the hearing on this matter that Skelton was not employed by Video Update and (assuming he was employed by Video Update) was not acting within the scope of his employment when he allegedly committed the assault and battery. Video Update also argues that, assuming Skelton was a managerial agent, he could not approve of his own conduct. Finally, Video Update argues that an employer must have some knowledge of the employee's bad acts to be subject to punitive damages.

Under Minn. Stat. § 549.20, subd. 2(c), "punitive damages can properly be awarded against an employer if the employee worked in a managerial capacity and acted in the scope of employment." Muehlstedt v. City of Lino Lakes, 473 N.W.2d 892, 896 (Minn. App. 1991); accord Kay v. Peter Motor Corp., Inc., 483 N.W.2d 481, 485 (Minn. App. 1992) (reasoning, in affirming an award of punitive damages against an employer, that "the knowledge of Lillemoe as

both employee and officer was properly imputed to the corporation by the trial court. Lillemoe, as chief executive officer, failed to bring under control his own conduct, which he knew was offensive and knew or should have known constituted sexual harassment"); Schmidt v. Miner, 184 N.W. 964 (Minn. 1921) ("In some jurisdictions the rule is that such damages may not be recovered from the principal or master unless he participated in the acts of his agent or servant, or previously authorized or subsequently ratified them. In other jurisdictions the rule is that if the agent or servant is liable for exemplary damages such damages may be recovered from the principal or master, even though the acts of the agent or servant were not authorized or ratified, provided of course they were done by the agent or servant in the course of the performance of the duties of his employment and were within its scope. This court has adopted the rule last above stated.").

The employer need not have knowledge of the wrongful conduct or ratify the conduct to be liable for punitive damages under § 549.20, subd. 2(c). Rather, liability under § 549.20, subd. 2(c) is vicarious–an employer is liable for punitive damages in connection with the underlying acts of its employee if the employee was "employed in a managerial capacity with authority to establish policy and make planning level decisions" and the employee was acting in the scope of employment. Minn. Stat. § 549.20, subd. 2 "imposes punitive damages to deter employment of unfit persons for important positions." Tennant Co. v. Advance Mach. Co., Inc., 355 N.W.2d 720, 723 (Minn. App. 1984).[9] The imposition of liability in subd. 2(c) for acts of top-level

[9] Tennant Co. was applying California law regarding principal/agent liability for punitive damages, but, as the court noted, "[s]ince both states apply the same rule, our decision speaks to the Minnesota business community as well." 355 N.W.2d at 723.

management clearly "reflects certain policy judgments about corporations, primarily that top management sets the company's ethical tone." Id. Minn. Stat. § 549.20, subd. 2 is modeled, almost identically, after the Restatement (Second) of Torts: Punitive Damages Against A Principal § 909 (1965). Again, the Restatement is instructive:

> Although there has been no fault on the part of a corporation or other employer, if a person acting in a managerial capacity *either* does an outrageous act or approves of the act by a subordinate, the imposition of punitive damages upon the employer serves as a deterrent to the employment of unfit persons for important positions.

RESTATEMENT (SECOND) OF TORTS: PUNITIVE DAMAGES AGAINST A PRINCIPAL § 909 (1979) (emphasis added).

Here, there is a factual dispute as to whether Skelton was the employee of Video Update and whether the assault and battery occurred in the scope of employment. It would be premature for this Court to resolve those factual issues now to preclude the pleading of a claim for punitive damages against Video Update. As the Minnesota Supreme Court has noted, "'In cases involving intentional wrongdoing, the scope of employment doctrine acquires something of an abstract quality, for such wrongdoing is never really within the scope of an employee's employment: if it were, then the employer's liability would be direct, not vicarious.'" Semrad v. Edina Realty, Inc., 493 N.W.2d 528, 537 (Minn. 1992) (citations omitted); see also Fahrendorff ex rel. Fahrendorff v. N. Homes, Inc., 597 N.W.2d 905, 913 (Minn. 1999) (holding a fact question existed as to whether a sexual assault by a group home supervisor occurred within the scope of employment); Martson v. Minneapolis Clinic of Psychiatry and Neurology, 329 N.W.2d 306, 312-13 (Minn. 1982) (reversing because of erroneous jury instructions and finding a fact issue with regard to whether a psychiatrist's sexual assault of two patients occurred within the scope of employment); but see P.L. v. Aubert, 545 N.W.2d 666, 668 (Minn. 1996) (holding that

teacher's sexual assault of student was not within the scope of employment). Suffice it to say that Skelton was employed by Video Update in some capacity–either employer/employee or independent contractor–, as directed by the Bankruptcy Court, to restructure Video Update's business operations and guide it through bankruptcy proceedings, Skelton was given the title Chief Restructuring Officer, Skelton was actually the person who was responsible for firing Plaintiff on behalf of Video Update, Skelton allegedly assaulted and battered Plaintiff while at work and while Plaintiff drove Skelton to business meetings and trips, Skelton's employment relationship with Video Update gave him the opportunity to allegedly assault and batter Plaintiff, and Skelton, given his position at Video Update, could exercise control over his contact with Plaintiff. Therefore, Plaintiff may assert a claim for punitive damages against Video Update for Skelton's alleged assault and battery.

### 3. Assault and Battery, Punitive Damages, and Crossroads

A similar analysis to that of Video Update applies to Crossroads. Skelton was clearly employed by Crossroads in a managerial capacity with policy and planning level authority. Skelton was a principal of Crossroads. Although the business plan or operations of Crossroads is not entirely clear, Crossroads, at least in this instance, appears to offer the management/restructuring expertise of its employees to struggling companies. Video Update contracted with Crossroads to supply it with expert personnel to help restructure its business. Skelton was the contracted for expert personnel. Skelton allegedly committed the assault and battery of Plaintiff while he was at Video Update. Whether Skelton committed the assault and battery in the scope of his employment with Crossroads–supplying Crossroads' expert management services–is a fact question that would be premature to resolve at this stage.

Accordingly, Plaintiff may assert a claim for punitive damages against Crossroads for Skelton's alleged assault and battery.

## IV. PLAINTIFF'S MOTION TO AMEND TO ADD A WHISTLEBLOWER CLAIM UNDER MINN. STAT. § 181.932

The Pretrial Scheduling Order requires that all motions to amend the pleadings, other than those seeking punitive damages, be filed by November 1, 2002. Plaintiff's motion to amend her complaint to add a whistleblower claim was filed on January 15, 2003. Therefore, Plaintiff's motion does not comply with the deadlines set by the Pretrial Scheduling Order. Plaintiff alleges in the proposed amendment that she was terminated by Video Update for reporting that Skelton was double-billing his expenses, a violation of law. At the hearing on this matter, Plaintiff conceded that she is not asserting a whistleblower claim against Skelton or Crossroads.

A brief background of a disturbing series of events follows. On May 10, 2001, Plaintiff brought a letter that she drafted to the Bankruptcy Judge and supporting documents regarding Skelton's double-billing to Video Update CEO Daniel Potter. (Kitchak Aff. Ex. F., at 77-78). Mr. Potter then faxed Plaintiff's letter and information to Chad Dale, counsel to the unsecured creditor's committee of Video Update/counsel to Video Update.[10] Id. at 78-79. Mr. Dale called Mr. Potter the next day, May 11, 2001, and essentially told Mr. Potter and Plaintiff not to send the letter to the Bankruptcy Judge.[11] Id. at 79-80. Plaintiff's May 2001 letter was never sent. On

---

[10] There appears to be some dispute between the parties as to whom Chad Dale was counsel.

[11] There is a factual dispute as to what Chad Dale actually said. Compare (Kitchak Aff. Ex. F., at 78-80), with e.g., (Van Tassel Aff. Ex. B, Letter from Joseph Crimmins, to Dorothy Anderson, Office of Bar Counsel (June 4, 2002)).

or about May 16, 2001, Mr. Potter "resigned" as Video Update's CEO–the entity purchasing Video Update's debt would only do so on the condition that there was a change in management. (Kitchak Aff. Ex. E, at 35 and Ex. F.). On May 24, 2001, Skelton, on behalf of Video Update, terminated Plaintiff. (Kitchak Aff. Ex. E, at 32). On October 11, 2001, Plaintiff sent a letter to Bankruptcy Judge Wizmur detailing Skelton's double-billing and Mr. Dale's alleged statements to Mr. Potter and Plaintiff telling them to "keep quiet." (Van Tassel Aff. Ex. B). Between October of 2001 and August of 2002, Plaintiff exchanged letters with the Massachusetts Bar Association and testified at an inquiry before the Bankruptcy Court as to Mr. Dale's conduct in handling Skelton's double-billing. Id. On November 13, 2002, after the Pretrial Scheduling Order's deadline for amendments had passed, Plaintiff was able to take Skelton's deposition. During his deposition, the following testimony occurred:

> Skelton: He [Terry Kissling] came to me–it was a day or two or three prior to Mr. Potter and the management team's separation from the company, so it was in the May 13, 14, 15 [2001] time frame. He came to me to inform me that Ms. Anderson and Mr. Potter were collecting records and assembling an analysis of double billings of air fares.
> Mr. Kaster: And what did you say?
> Skelton: I said, "I appreciate you bringing that to my attention. Would you provide me with a memo and the analysis reconciling those so that I can take care of it through a credit on the next Crossroads' bill."
> Mr. Kaster: Did you know right away that there was an over billing?
> Skelton: Yes, I did.
> Mr. Kaster: So you knew you were caught, basically?
> Skelton: Yes, I did.
> Mr. Kaster: Were you angry?
> Skelton: I wouldn't say anger was the emotion that came to mind.
> Mr. Kaster: Was there an emotion that came to mind?
> Skelton: Maybe embarrassement, whatever emotion you feel when you say "Caught."
> Mr. Kaster: Did you fire Nikki Anderson?
> Skelton: I did terminate her employment, yes.
> M. Kaster: Sometime following that notice by Mr. Kissling?

Skelton: Yes, it was after that point.

(Kitchak Aff. Ex. E., at 31-32).

Later in November of 2002, Plaintiff's counsel received a phone call from Mark Gehan, counsel for Mr. Potter. (Kaster Aff. ¶7). Mr. Potter has a separate claim against Video Update regarding his severance because Video Update stopped payment to Mr. Potter alleging that he committed fraud against Video Update. (Kaster Aff. ¶8, Kitchak Aff. Ex. F). Mr. Gehan told Plaintiff's counsel that Mr. Potter received an offer in connection with his claim that Mr. Potter could receive his severance pay if Mr. Potter persuaded Plaintiff (Ms. Anderson) to dismiss the present case. (Kaster Aff. ¶9). Plaintiff and counsel and Mr. Potter and counsel had a meeting to discuss this unusual matter in December of 2002. Id. at ¶10. In January of 2003, Plaintiff moved to amend to assert her whistleblower claim.

### A. "Good Cause" Standard

"Where, as here, the deadline for the amendment of pleadings has long since expired, the propriety of the Motion for leave to amend 'is most properly considered within the framework of Rule 16(b), Federal Rules of Civil Procedure.'" Luigino's, Inc. v. Pezrow Companies, 178 F.R.D. 523, 525 (D. Minn. 1998) (citations omitted). Although "[i]t is true that the Federal Rules are usually liberally construed to permit parties to amend pleadings" under Rule 15, "[a]s regards case management orders . . . the Federal Rules set a less forgiving standard. Federal Rule of Civil Procedure 16(b) specifies that such an order 'shall not be modified except upon a showing of good cause and by leave of the district judge' [or by a magistrate judge]. Thus, a moving party must first make the requisite showing. *Even then* the district court retains discretion as to

whether to grant the motion. As a vehicle designed to streamline the flow of litigation through our crowded dockets, we do not take case management orders lightly, and will enforce them." Bradford v. DANA Corp., 249 F.3d 807, 809 (8th Cir. 2001) (emphasis added) (citing In re Milk Prods. Antitrust Litig., 195 F.3d 430, 437 (8th Cir. 1999)). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." Bradford, 249 F.3d at 809 (citing Johnson v. Mammoth Recreations, Inc., 975 F.2d 604 (9th Cir. 1992)). In the end, however, this Court "look[s] for 'good cause,' not for 'superlative cause.'" Scheidecker v. Arvig Enter., Inc., 193 F.R.D. 630, 633 (D. Minn. 2000).

### B. Whether Good Cause Has Been Shown

Video Update argues that Plaintiff's counsel knew of the facts underlying Plaintiff's whistleblower claim well before the amendment deadline of November 1, 2002. Specifically, Video Update argues that Plaintiff's counsel knew, through documents she actually produced to Video Update (Van Tassel Aff. Ex. B), that Chad Dale was the person that told Plaintiff not to send a letter to Bankruptcy Court Judge Wizmur detailing Skelton's double-billing. Video Update concludes that "it is utterly incredible for Plaintiff now to claim that she did not know, until recently, of Mr. Dale's alleged instruction, which forms the linchpin of her proposed amendment, to refrain from reporting Mr. Skelton's double billing." (Video Update's Mem. in Opposition to Pl.'s Mot. to Amend, at 11).

Mr. Dale's instruction does not form the linchpin of Plaintiff's amendment. Rather, the linchpin of Plaintiff's amendment is Skelton's admission during his deposition that he knew prior to firing Plaintiff that Plaintiff was collecting information about Skelton's double-billing. (Kaster Aff. ¶15). Plaintiff's counsel did not know that Skelton would actually admit this crucial

information. Id. It was not until Skelton made this admission and then was presented with the peculiar offer received by Mr. Potter that Plaintiff's counsel felt it appropriate seek to add a whistleblower claim.

When structuring Pretrial Scheduling Orders, courts establish an early deadline for amending the pleadings and adding parties, typically a much later deadline for the close of discovery, and finally a deadline for all other non-dispositive motions shortly after the close of discovery. Pretrial Scheduling Orders are structured as such for a purpose. The early deadline for amending pleadings and adding parties is established so that during discovery parties may be usefully informed of and confident about the claims and parties actually involved in the case. A later deadline for the close of discovery allows the parties to illuminate the merits of the claims asserted. An early amendment deadline, however, can cause problems. This is so because many times discovery can reveal new claims, add a necessary piece to a not yet brought and theretofore borderline claim, or solidify the resolve to bring a potential claim. In applying Federal Rule of Civil Procedure 16(b), many courts have cited to Rule 1 for the proposition that Pretrial Scheduling Orders should be enforced to secure the speedy and inexpensive resolution of cases. See, e.g., Archer Daniels Midland Co. v. Aon Risk Serv., Inc., 187 F.R.D. 578, 582 (D. Minn. 1999); Marcum v. Zimmer, 163 F.R.D. 250, 253 (S.D. W.Va. 1995). This Court agrees. In accordance with Rule 1, the Federal Rules of Civil Procedure should also be construed to secure the "just" resolution of cases.

Here, the fact that Plaintiff did not have some information from Skelton showing that Skelton knew prior to firing Plaintiff that Plaintiff was collecting information about double-billing caused Plaintiff not to bring the whistleblower claim. (Kaster Aff. ¶15, 16). This position

was reasonable and represents good cause for not bringing the claim. Plaintiff should not be punished because Plaintiff's counsel thought it more appropriate to diligently investigate the true merits of a claim before blindly following interested allegations/statements. Such an inquiry is demanded by Federal Rule of Civil Procedure 11(b), and the fact that Plaintiff's counsel may have conducted a more extensive investigation than was necessary before bringing the claim is only commendable. Plaintiff did not delay in securing the information she deemed necessary to assert a whistleblower claim. For reasons not explained by either party, Skelton's deposition was not scheduled until twelve days after the amendment deadline. Skelton's deposition contained the key ingredient to shape Plaintiff's whistleblower claim, and Plaintiff and her counsel were reasonably diligent in securing that information and bringing the claim. Although this may be a borderline case of good cause or diligence, this Court thinks it is most appropriate in such cases to foster the "just" resolution of cases by allowing claims to be tested on the merits.

### C. <u>Futility of a Whistleblower Claim</u>

Video Update argues that Plaintiff's whistleblower claim would be futile because Plaintiff blew the whistle on Skelton not Video Update, and, therefore she cannot state a whistleblower claim. (Video Update's Mem. in Opposition to Pl.'s Mot. to Amend, at 12).

Plaintiff's proposed whistleblower claim under Minn. Stat. § 181.932 is not futile. Minn. Stat. § 181.932 provides in relevant part:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because: (a) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of *any* federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official . . . .

(Emphasis added).

"[T]he Whistleblower Act, Minn. Stat. § 181.932, subd. 1(a), does not require that an employee specifically identify in the pleadings the law or rule adopted pursuant to law that the employee suspects has been violated . . . ." Abraham v. County of Hennepin, 639 N.W.2d 342, 355 (Minn. 2002). In addition, the alleged violation of law need not implicate some important public policy. Id. at 354 (holding that Minn. Stat. § 181.932, subd. 1(a) "does not require that an employee's report of a violation or suspected violation of law or rule adopted pursuant to law implicate public policy"); Anderson-Johanningmeier v. Mid-Minnesota Women's Ctr., Inc., 637 N.W.2d 270, 277 (Minn. 2002) ("[W]e reject the importation of a public policy requirement into the whistleblower statute and hold that the protections of section 181.932, subd. 1(a), are not limited to reports that implicate public policy.").

Video Update's argument that Skelton was not its employee confuses the issue. For purposes of a motion to amend and futility analysis under Federal Rule of Civil Procedure 12(b)(6), this Court must take all of Plaintiff's allegations as true and draw all reasonable inferences in Plaintiff's favor. E.g., Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). Moreover, Skelton was actually the person responsible, on behalf of Video Update, for firing Plaintiff. (Kitchak Aff. Ex. E, at 32).

Video Update's argument that Plaintiff blew the whistle on Skelton and not Video Update also confuses the issue, and Video Update cites no authority in support of its argument. An employee can maintain a whistleblower claim against an employer by reporting violations of law of a supervisor. See, e.g., Hedglin v. City of Willmar, 582 N.W.2d 897, 902, 903 (Minn. 1998).

In Hedglin, firefighters alleged that a supervisory firefighter (Schroeder) fraudulently altered "roll call sheets" so that Schroeder would be paid for responding to fire calls in which he actually did not attend as well as allegations that certain other firefighters drove fire trucks while drunk. Id. at 902. The Court allowed the plaintiffs to proceed with their cause of action and held that "[t]he reports of the falsification of roll call sheets and drunk driving implicate state law violations, . . . and, therefore, fall within the protection of the statute." Id. at 903. Here, Plaintiff similarly alleges that Skelton double-billed so he would be reimbursed for travel that was actually already paid for. Vonch v. Carlson Companies, Inc., 439 N.W.2d 406 (Minn. App. 1989) is not to the contrary. In Vonch, Vonch reported to the vice president of personnel that his supervisor was committing theft and fraud through travel expense improprieties. Id. at 407. The company restructured Vonch's department and Vonch was offered a different position, but he refused and brought a wrongful discharge claim under the public policy exception to the at-will rule. Id.; see also Anderson-Johanningmeier, 637 N.W.2d at 274. The Minnesota Court of Appeals affirmed a grant of summary judgment in favor of the company *because* the alleged violation of law by Carlson's corporate officer did not implicate the public interest. Id. This case was decided before the Whistleblower Act was enacted. "Therefore, any statements made by the Vonch court do not apply to claims brought specifically under the statute." Hedglin, 582 N.W.2d at 903. As noted above, the Minnesota Supreme Court has since squarely held that a violation of law does not need to implicate public policy to come within the protection of the Whistleblower Act. The Vonch case, however, actually impliedly supports Plaintiff's claim because it recognized Vonch's potential claim but for the fact that the alleged violation of law did not implicate the public interest.

Therefore, Plaintiff's whistleblower claim is not futile, and Plaintiff is granted leave to assert such claim against Video Update.

**THEREFORE, IT IS HEREBY ORDERED that:**

1. Defendant Video Update's Motion to Amend to Assert Crossclaims (Doc. No. 20) is **GRANTED IN PART** and **DENIED IN PART**.

2. Plaintiff's Motion to Amend the Complaint (Doc. No. 42) is **GRANTED**.

Dated: April 17, 2003

SUSAN RICHARD NELSON
United States Magistrate Judge