**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Nikki J. Anderson,

Plaintiff,

v.

Crossroads Capital Partners, L.L.C., Crossroads, Inc., Video Update, Inc., and James A. Skelton, an individual,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-2000 ADM/SRN

---

John A. Klassen, Esq., and Michael L. Puklich, Esq., Neaton, Puklich, & Klassen, Minnetonka, MN, appeared for and on behalf of Plaintiff.

Ronald J. Lee, Esq., Faegre & Benson L.L.P., appeared for and on behalf of Defendants Crossroads Capital Partners, L.L.C., and Crossroads, Inc.

Justin H. Perl, Esq., and Dawn C. Van Tassel, Esq., Maslon, Edelman, Borman & Brand, L.L.P., Minneapolis, MN, appeared for and on behalf of Defendant Video Update, Inc.

Thomas P. Kane, Esq., and Jodi L. Johnson, Esq., Hinshaw & Culbertson, Minneapolis, MN, appeared for and on behalf of Defendant James A. Skelton.

---

## I. INTRODUCTION

Defendant Video Update, Inc.'s ("Video Update") Motion for Summary Judgment [Docket No. 73] was argued before the undersigned United States District Judge on October 15, 2003. The Court also heard the Joint Motion to Dismiss [Docket No. 89] of Defendants Crossroads Capital Partners, L.L.C., Crossroads, Inc. (collectively, "Crossroads"), Video Update and James A. Skelton ("Skelton") (collectively, "Defendants"). For the reasons explained below, Video Update's Motion for Summary Judgment is granted in part and denied in part, and Defendants' Joint Motion to Dismiss is denied.

FILED FEB 1 1 2004
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD_____
DEPUTY CLERK_____

## II. BACKGROUND

Plaintiff Nikki J. Anderson ("Anderson" or "Plaintiff") brings sexual harassment and whistleblower claims against Defendants.[1] Video Update employed Anderson as an executive assistant from approximately January 2000 until May 24, 2001 when her employment was terminated. Potter Dep. at 13; see also Compl. ¶ 26. Anderson worked primarily for former Video Update CEO and President Daniel Potter ("Potter"), but also provided administrative assistance to Skelton after he became Chief Restructuring Officer ("CRO") of Video Update starting in December 2000. Skelton was appointed as CRO after Video Update, which was undergoing bankruptcy reorganization, contracted with Crossroads to help restructure the company. Anderson Dep. at 54-56; see Servs. Agrmt. between Crossroads & Video Update ("Agrmt") (Van Tassel Aff. Ex. C). Skelton was employed and paid by Crossroads while working on site at Video Update. Skelton Dep. at 29-31, 105; Agrmt. ¶ 1.

Anderson claims that Skelton began harassing her in February 2001. Anderson Dep. at 300-03. According to Anderson, Skelton groped her thighs, breasts, buttocks, and pubic area on several occasions when she drove him to the airport. Id. at 300-03, 330-31, 334-36. Anderson alleges that Skelton sexually touched her twice in the Video Update office as well, and that he brought a Frederick's of Hollywood lingerie catalogue to work and encouraged female employees to place orders. Id. at 131-35, 140-45, 371-74, 381-82. He also threatened her job, asked her out, and requested her to model lingerie for him. Id. at 145, 301-03, 337. Anderson says that she told Skelton to stop touching her, but did not report the harassment to anyone

[1] For purposes of the instant Motion, the facts are viewed in the light most favorable to Plaintiff, the nonmoving party See Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

because she believed that it would jeopardize her future with Video Update. Id. at 107, 121. Anderson was aware of Video Update's sexual harassment policy, which required her to report the harassment in writing to her supervisor or to the human resources department. Id. 144-46; see Video Update's Corporate Policy Manual (Van Tassel Aff. Ex. D).

Anderson further alleges that Skelton fired her after she reported him for fraud. In February 2001, Anderson discovered that Skelton was double-billing Crossroads and Video Update for expenses. Anderson Dep. at 174-77. She claims that she brought the issue to Skelton's attention several times between February and April 2001, but that Skelton told her to stay out of the matter. Id. at 176, 178. She reported the double-billing to Potter on May 10, 2001, and explained that she planned to send a letter disclosing it to Judge Judith Wizmer who was adjudicating Video Update's bankruptcy proceedings. Id. at 178-80; see also Potter Dep. at 77. Potter then reported the problem to Chad Dale ("Dale"), Video Update's bankruptcy attorney. Potter Dep. at 78. Dale asked Potter and Anderson to refrain from sending the letter to the Bankruptcy Judge while he investigated Anderson's allegations. Dale Dep. at 34-37 (Van Tassel Aff. Ex. I). Dale determined that Skelton had claimed expenses from both companies, and confronted Skelton about the billing on May 29, 2001. Id. at 40-42. On or around May 13, 2001, Skelton learned that Anderson had reported his double-billing, and he later admitted to billing both Crossroads and Video Update for his expenses. Skelton Dep. at 27-32. Anderson eventually mailed the letter to Judge Wizmer in October 2001. See Letter from Anderson to Judge Wizmer of May 8, 2001 (Van Tassel Aff. Ex. G).

On May 2, 2001, Movie Gallery, Inc. ("Movie Gallery"), a competitor of Video Update, purchased Video Update's debt and became its principal stakeholder. Malugen Aff. ¶ 2. As a

condition of extending financing, Movie Gallery required Video Update's directors and officers, including Potter, to resign. Id. ¶ 3. Joe Malugen ("Malugen"), Movie Gallery's Chairman, CEO, and President, was concerned that executive staff who had worked closely with former officers might maintain old loyalties, and recommended to Skelton that they be dismissed as well. Id. ¶¶ 4-6. As a result, Potter was fired on May 16, 2001, and Skelton terminated Anderson's position on May 24, 2001. During 2001 most employees from Video Update's Minnesota corporate office were laid off, and the office was closed after Movie Gallery acquired Video Update in December 2001 and relocated the office to Alabama. Pongonis Aff. ¶¶ 2-3.

Anderson filed suit on November 1, 2001, alleging that Skelton fired her because she reported his double-billing. Anderson also brings claims for assault and battery, and sex discrimination under both Title VII and the Minnesota Human Rights Act ("MHRA"), and seeks punitive damages. See Third Am. Compl.

As the parties proceeded through discovery, Defendants sought to recover the hard drive of Plaintiff's personal computer because it allegedly contained a document that outlined Skelton's harassment. Anderson Dep. at 171-74, 261, 263. Defendants wanted to know the exact date Plaintiff created the chronology and whether she had written different versions of the document. Anderson claimed that she owned the same computer throughout the time frame applicable to the litigation, including the computer she used in October 2001 when she first created the chronology. Anderson could not recall altering the hard drive in any way. Anderson Dep. at 263. She also agreed on the record that she would not "purge or delete that drive" or "delete any existing documents." Id. at 264-66.

After a protracted discovery battle where Skelton's counsel first informally and then

formally requested production of the hard drive, Skelton's counsel initiated a Motion to Compel. See Johnson Aff. Ex. C; see also Order of June 3, 2003 [Docket No. 72]. Skelton's counsel served Anderson's counsel with notice of the Motion to Compel on April 18, 2003. See Johnson Aff. Ex. A. Magistrate Judge Nelson agreed that the hard drive contained discoverable material, and ordered Anderson to furnish Skelton with a "copy of all documents/files relevant to this litigation that exist on Ms. Anderson's personal computer as well as those that have been deleted or otherwise adulterated." Order of June 3, 2003.

Pursuant to the Magistrate Judge's June 3rd Order, Skelton's computer expert Jeremy Wunsch ("Wunsch") examined the computer's hard drive on July 11, 2003, limiting his search to November 1, 2000 to the present. Wunsch Aff. ¶¶ 4-5. Wunsch discovered that the hard drive on the computer was manufactured in August 2002. Id. ¶ 5. Additionally, Wunsch found that the hard drive contained a data wiping software application that was installed in September 2002, and last run on April 18, 2003. A professional version of the application called "CyberScrub" was installed on April 17, 2003, and had been most recently used on April 20, 2003. Id. ¶ 7. CyberScrub essentially erases all data from the hard drive and precludes both software and hardware recovery. See Johnson Aff. Ex. D. Plaintiff claims that she did not use CyberScrub to destroy evidence, and states that she regularly utilized the program to protect her computer files. She also says that in her view she has owned the same computer throughout this litigation despite changing the hard drive. Anderson Aff. ¶¶ 2-9.

## III. DISCUSSION

Defendant Video Update now moves for summary judgment, and Defendants' jointly move to dismiss Plaintiff's Complaint for discovery violations.

**A. Video Update's Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Video Update seeks summary judgment concerning the counts brought against it, which include a common law assault and battery claim, Title VII and MHRA sex discrimination claims, a violation of the Minnesota Whistleblower Act, and a demand for punitive damages. Starting with Plaintiff's claim for assault and battery, Anderson alleges that Video Update is liable for Skelton's offensive conduct under the doctrine of respondeat superior. The doctrine states that "an employer is vicariously liable for the torts of an employee committed within the course and scope of employment." Schnieder v. Buckman, 433 N.W.2d 98, 101 (Minn. 1988). To prevail under this theory, the plaintiff must prove the existence of an employee-employer relationship. See Employers Nat'l Ins. Co. v. Breaux, 516 N.W.2d 188, 190 (Minn. Ct. App. 1994).

Video Update contends that it is not liable under respondeat superior because it was not

Skelton's employer, as Crossroads paid Skelton's salary and eventually fired him. Citing the borrowed servant doctrine, Plaintiff counters that Video Update is liable regardless of who technically employed Skelton because Video Update borrowed Skelton to perform a special service and controlled his daily work activities. The borrowed servant doctrine states that "if an employer loans an employee to another for the performance of some special service, then that employee, with respect to that special service, may become the employee of the party to whom his services have been loaned." Danek v. Meldrum Mfg. & Eng'g Co., Inc., 252 N.W.2d 255, 258 (Minn. 1977). The special employer faces liability for the borrowed employee's tortious acts if the employer controls or directs the employee's work. See Nepstad v. Lambert, 50 N.W.2d 614, 620-21 (Minn. 1951). The source of the employee's salary and the right of discharge, while important factors in this analysis, are not necessarily conclusive. See Ahlstrom v. Minneapolis, St. Paul, & Sault St. Marie R.R. Co., 68 N.W.2d 873, 884-85 (Minn. 1955).

Whether Video Update controlled Skelton's job tasks to the extent that he was its borrowed servant raises factual issues that must be determined by the jury. While Crossroads paid Skelton's wages and retained ultimate firing authority, the record suggests that Video Update also controlled Skelton's work. See Skelton Dep. at 29-31, 105, 144-53. Skelton reported to Potter who was then Video Update's CEO and President, and additionally answered to Video Update's attorneys and board of directors. See id. at 91, 94-95, 97-98; see also Agmt (Van Tassel Aff. Ex. C). Further, nothing in the record suggests that Crossroads directed Skelton's daily activities. Because a jury could find that Skelton was Video Update's employee

based on this evidence, summary judgment on Plaintiff's assault and battery claim is denied.[2]

Video Update also moves for summary judgment regarding Plaintiff's Title VII and MHRA sexual discrimination claims. See 42 U.S.C. § 2000e et seq.; Minn. Stat. §§ 363.01-363.03. To succeed in her claim of sexual harassment under Title VII and the MHRA against a supervisor,[3] Anderson must prove: 1) she is a member of a protected group; 2) she was subject to unwelcome harassment; 3) a causal relationship between the harassment and her membership in a protected group; and 4) the harassment affected a term or condition of her employment. See Hovecar v. Purdue Frederick Co., 223 F.3d 721, 736 (8th Cir. 2000). Harassment impacts a term or condition of employment if: 1) it results in a tangible employment action; or 2) is sufficiently severe or pervasive to create a hostile work environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Video Update first contends that Plaintiff's claims must be dismissed because she fails to link her termination to the alleged harassment. While termination is a tangible employment action, the aggrieved employee must prove that her firing resulted directly from the sexual harassment. See Newton v. Caldwell Labs, 156 F.3d 880, 881-83 (8th Cir. 1998). If the employer offers legitimate, non-discriminatory reasons for the termination, the employee bears

---

[2] Video Update also argues that the borrowed servant doctrine does not impose liability for intentional torts like assault and battery. However, the court did not rule on this issue in Butler v. Leadens Investigations & Security, 503 N.W.2d 805 (Minn. Ct. App. 1993), the only case Video Update cites to support its argument. While the case law in this area is admittedly sparse, at least one Minnesota appellate court decision suggests that employers may be liable for the intentional torts of borrowed servants. See Kohoutek v. Hafner, 366 N.W.2d 633, 638 (Minn. Ct. App. 1985) (rev'd on other grounds, Kohoutek v. Hafner, 383 N.W.2d 295 (Minn. 1986)).

[3] The same standards are utilized in analyzing sexual harassment under both Title VII and the MHRA. See Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999).

the burden of proving that the explanation is pretextual. The employee's claims withstand summary judgment only if the evidence presented: 1) creates factual issues suggesting that the explanation is pretextual; and 2) creates a reasonable inference indicating that discrimination was a determinative factor in the adverse employment action. See Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996).

Plaintiff's wrongful termination sexual harassment claim cannot survive summary judgment because she has not established that Video Update's basis for terminating her position is pretextual. Video Update argues that Plaintiff's termination resulted from the bankruptcy restructuring. By December 2001, eighty-four employees from the corporate headquarters had been laid off, and only four remained. See Pongonis Aff. ¶ 2. Many terminated employees were executive assistants like Anderson, because Joe Malugen, Chairman, President, and CEO of Movie Gallery, Video Update's senior creditor, recommended to Skelton that executive support staff be removed. Further, the evidence does not suggest that discriminatory intent motivated Malugen's actions. While the parties contest whether Malugen learned that Skelton had brought a Frederick's of Hollywood catalogue to the office, they agree that Malugen knew nothing of Anderson's specific allegations against Skelton. Malugen Aff. ¶¶ 7-8; Potter Dep. at 130-32. Finally, the significance of the timing of Plaintiff's termination on May 24, 2001, shortly after she allegedly asked Skelton to stop harassing her, does not reveal pretext because Skelton terminated Plaintiff only after receiving instructions from Malugen on May 23, 2001. Malugen Aff. ¶ 6; Skelton Dep. at 81. Because Plaintiff has not shown that Video Update's explanation is pretextual, her wrongful termination sexual harassment claim is dismissed.

Video Update also argues that Plaintiff has not established a claim for hostile work

environment sexual harassment. To establish a prima facie claim, the plaintiff must show that the alleged harassment rose to the level of a hostile work environment, as viewed from both an objective and a subjective perspective. Harris, 510 U.S. at 21-22. A hostile work environment is one that "is permeated with 'discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Id. at 21. Its existence is determined by the totality of the circumstances, which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance." Id. at 23; see Howard v. Burns Bros., 149 F.3d 835, 840 (8th Cir. 1998). Because Title VII is not intended to impose a "general civility code" in the workplace, isolated incidents are usually not actionable. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation omitted); see also Meriwether v. Caraustar Packaging Co., 326 F.3d 990, 993 (8th Cir. 2003). However, if sufficiently severe and extreme, individual occurrences can amount to harassment. See Hathaway v. Runyon, 132 F.3d 1214, 1223 (8th Cir. 1997).

Taking Anderson's allegations as true, she has shown that Skelton's actions created a hostile work environment from both objective and subjective perspectives. While Skelton's requests that Anderson have drinks with him and order lingerie fall short of this standard, his alleged groping and sexual touching constitute severe and pervasive harassment. Thus, Plaintiff has established a prima facie claim for hostile work environment sexual harassment.

Video Update next asserts that Plaintiff's claims are barred even assuming that Skelton's actions created a hostile work environment, because Plaintiff unreasonably failed to follow the

company's sexual harassment reporting procedure. Video Update asserts the affirmative defense expounded in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). In these cases, the Supreme Court delineated the limit on an employer's liability for the discriminatory acts of a supervising employee "when no tangible employment action is taken" against the plaintiff. Ellerth, 524 U.S. at 765. The Court held that in such circumstances "a defending employer may raise an affirmative defense" and avoid vicarious liability by establishing "(a) that the employer exercised reasonable care to prevent and correct any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id.; Faragher, 524 U.S. at 807. In both Ellerth and Faragher, the Court was explicitly dealing with "misuse of supervisory authority," as distinct from co-worker harassment. Ellerth, 524 U.S. at 764; Faragher, 524 U.S. at 804.

Video Update may apply the Ellerth/Faragher affirmative defense because it exercised reasonable care in preventing sexual harassment and Anderson unreasonably failed to report Skelton's behavior. First, Video Update took steps to avoid sexual harassment by implementing a company-wide sexual harassment procedure that was available to employees in the office policy manual. See Van Tassel Aff. Ex. D. Having an effective and well-disseminated company sexual harassment policy satisfies the first prong of the Ellerth/Faragher defense. See Faragher, 524 U.S. at 806-07. Plaintiff contends that Video Update's policy was ineffective because it required Plaintiff to report the harassment to a supervisor. She alleges that this meant requiring her to report to Skelton. However, Plaintiff's argument lacks merit since Potter was her chief supervisor during the period when Skelton harassed her and she could have told Potter about

Skelton's actions. Anderson's unreasonable failure to report the harassment to Potter satisfies the defense's second prong. Id. While Skelton assigned Plaintiff some job tasks, she continued to work primarily for Potter as well and had a positive relationship with him. See Anderson Dep. at 84-85. Even assuming that she could not have told anyone else at Video Update about Skelton's conduct, she could have confided in her supervisor Potter, who she had worked with prior to Skelton's arrival at her workplace. Therefore, Video Update's Motion for Summary Judgment is granted concerning Plaintiff's claims for Title VII and MHRA sexual harassment, and these claims are dismissed.

Video Update additionally moves for summary judgment regarding Plaintiff's Minnesota state law whistleblower claim. Minnesota Statute § 181.932(a) prohibits an employer from discharging or penalizing an employee who in good faith reports a violation of state or federal law. To establish a prima facie case of retaliatory discharge, the employee must show: "1) statutorily-protected conduct by the employee; 2) adverse employment action by the employer; and 3) a causal connection between the two." Hubbard v. United Press Int'l Inc., 330 N.W.2d 428, 444 (Minn. 1983).

Plaintiff fails to establish a prima facie case. Anderson satisfies step one because she reported Skelton's fraudulent double-billing, and fraud violates state law. She also satisfies step two because Skelton fired her less than two weeks after she informed Video Update of the fraud. The close temporal proximity between Plaintiff's report and her termination implicates the whistleblower statute at first glance. See Cokely v. City of Otsego, 623 N.W.2d 625, 632-33 (Minn. Ct. App. 2001). However, Anderson's failure to adequately address Malugen's role in the termination decision eviscerates this initial suggestion of improper reprisal. Anderson has not

revealed a causal connection between her reporting the double-billing and her termination. Malugen did not know about Anderson's report of the "fraud" when he recommended to Skelton that executive assistants be terminated. Malugen Aff. ¶ 9. Further, as explained above, almost all of Video Update's corporate employees lost their jobs during 2001 and Plaintiff has not distinguished herself from these other individuals. Pongonis Aff. ¶¶ 2-3. Video Update's Motion for Summary Judgment is granted as to Plaintiff's whistleblower claim.

Video Update's final summary judgment argument relates to Plaintiff's request for punitive damages. Video Update faces potential liability for punitive damages under theories of both direct and vicarious liability. Employers are directly liable for punitive damages if they engaged in discriminatory practices with malice or reckless indifference to an employee's rights. See 42 U.S.C. § 1981a(b)(1). Plaintiff does not appear to request punitive damages under a direct liability theory, and regardless has not shown that Video Update acted with malice or reckless indifference to Anderson's rights. Consequently, Plaintiff may not recover punitive damages premised on Video Update's direct liability.

Plaintiff does clearly seek punitive damages against Video Update under a vicarious liability theory. In Kolstad v. Amer. Dental Ass'n, 527 U.S. 526, 542-43 (1999), the Supreme Court cited the Restatement of Agency (Second) to determine whether an employer may be held vicariously liable for punitive damages. An agent's misconduct may be imputed to an employer who will be liable for punitive damages if: a) the principal authorized the doing and the manner of the act; or b) the agent was unfit and the principal was reckless in employing him; or c) the agent was employed in a managerial capacity and was acting in the scope of that employment; or d) the principal or a managerial agent of the principal ratified or approved the act. See

Restatement (Second) of Agency § 217C.[4] Plaintiff asserts that Video Update is liable under parts b and c.

Assuming arguendo that Video Update meets the test for vicarious liability, Plaintiff's punitive damages claim still fails as a matter of law because Video Update made good faith efforts to prevent workplace discrimination. The Supreme Court recognized this exception in Kolstad, and held that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." Kolstad, 527 U.S. at 545 (citations omitted). As discussed above, Video Update's sexual harassment policy constitutes a reasonable and good faith effort to protect employees' Title VII rights. Plaintiff knew about the policy but still unreasonably failed to report the harassment, leaving Video Update without any knowledge of Plaintiff's allegations that Skelton had groped her. While Potter and Dale, Video Update's bankruptcy counsel, knew that Skelton brought a lingerie catalogue to work, this lone incident does not constitute sexual harassment under Title VII or MHRA. See Duncan v. General Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002) (holding that plaintiff did not establish a sexual harassment claim though defendant touched her hands, told her that he wanted a sexual relationship, asked plaintiff to draw a sexually suggestive planter, requested that she type a draft of beliefs of the "He-Men Women Hater's Club," and put up a poster depicting plaintiff as president of the "Man Hater's Club"). Therefore, Video Update is

---

[4] The language in Minn. Stat. § 549.20, subd. 2 which creates vicarious liability for punitive damages under state law is nearly identical to § 217C. Thus, the Court employs the same standard in determining whether to grant Video Update's summary judgment motion regarding punitive damages.

not vicariously liable for punitive damages and Plaintiff's claim is dismissed.

In short, Video Update's Motion for summary judgment is granted regarding Plaintiff's sexual harassment, whistleblower, and punitive damages claims, but denied concerning Plaintiff's assault and battery action.

**B. Defendants' Joint Motion to Dismiss**

Defendants jointly move to dismiss the Complaint due to Plaintiff's alleged discovery violations and destruction of evidence. Dismissal is justified when a litigant's conduct abuses the judicial process, but should be used sparingly as "in our system of justice the opportunity to be heard is the litigant's most precious right." Martin v. DaimlerChrysler Corp., 251 F.3d 691, 693 (8th Cir. 2001) (citations omitted). While Anderson's exceedingly tedious and disingenuous claim of naivete' regarding her failure to produce the requested discovery, the age of her computer hard drive, and her use of CyberScrub defies the bounds of reason, her behavior is not sufficiently egregious to warrant dismissal. See Pope v. Fed. Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) (affirming the district court's dismissal of a Title VII claim where the plaintiff introduced manufactured evidence and perjured testimony). However, because Anderson intentionally destroyed evidence and thus attempted to suppress the truth, the Court will give the jury an adverse inference instruction at trial. See Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 746 (8th Cir. 2004).

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Video Update's Motion for Summary Judgment [Docket No. 73] is **GRANTED** as to Plaintiff's Title VII and MHRA sexual harassment, whistleblower, and punitive damages claims, and **DENIED** as to Plaintiff's assault and battery claim. These claims are dismissed with prejudice from the Third Amended Complaint [Docket No. 65] as to Defendant Video Update.

2. Defendants' Joint Motion to Dismiss [Docket No. 89] is **DENIED**.

3. Due to Plaintiff's flagrant discovery violations and intentional destruction of potential evidence, the Court will give the jury an adverse inference instruction during trial concerning any and all discoverable material which was present on the hard drive of Plaintiff's personal computer.

BY THE COURT:

s/Ann D. Montgomery

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: February 10, 2004